Filed 12/2/15  P. v. Ferreira CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JEREMY BENJAMIN FERREIRA,<br><br>    Defendant and Appellant. | B257760<br><br>(Los Angeles County<br>Super. Ct. No. GA082851) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Stan Blumenfeld, Judge.  Affirmed.

Law Offices of Mark J. Werksman and Kelly C. Quinn for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Jeremy Benjamin Ferreira (defendant) appeals from the judgment entered when the trial court revoked his probation and ordered imposition of a previously suspended five-year prison sentence. Defendant contends that the trial court abused its discretion in granting the prosecution's motion for continuance of the probation revocation hearing, and that his due process rights were violated because the hearing was not held within a reasonable time or on proper notice, and because he was precluded from presenting mitigating evidence. Defendant also contends that the trial court's finding that he violated probation was not supported by substantial evidence, and that he is entitled to additional custody credit. Finding no merit to defendant's contentions, we affirm the judgment.

## BACKGROUND

In 2011, defendant was charged with one count of mayhem upon Jacqueline C. (Jacqueline), in violation of Penal Code section 203,[1] and one count of corporal injury to a spouse or cohabitant in violation of section 273.5, with a special allegation of great bodily injury within the meaning of section 12022.7, subdivision (e).

Defendant entered into a plea agreement under which he pled no contest to a violation of section 273.5, and admitted the great bodily injury allegation, in exchange for dismissal of the mayhem count, a suspended sentence of five years in prison, and placement on probation.

On July 22, 2011, the trial court sentenced defendant pursuant to the terms of the plea agreement to five years in prison (the low term of two years plus three years for the great bodily injury enhancement). Imposition of the sentence was suspended and defendant was placed on probation for three years, with terms including 365 days in jail in addition to drug and domestic violence counseling. The court warned defendant that if he violated the terms and conditions of his probation the five-year prison term would be imposed. The court also issued a detailed protective order prohibiting all contact and communication with Jacqueline.

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

2

A motion for the revocation of defendant's probation due to alleged incidents of domestic violence against Stacey L. (Stacey) was filed in January 2014. On May 2, 2014, the People filed additional grounds for revocation, based upon recent contact with Jacqueline.[2] The trial court heard testimony on March 21, May 8 and May 29, 2014. On May 29, 2014, the court found defendant to be in violation of probation and imposed the original sentence of five years in prison. Defendant filed a timely notice of appeal.

**Prosecution evidence**

### Incident of August 11, 2013

Los Angeles Police Officer Miguel Salcedo-Mata testified that on August 11, 2013, he and his partner were sent to Stacey's home to investigate a battery report. Upon arrival they found Stacey in her car outside the residence. She was crying, visibly shaken, and fearful. Stacey told Officer Salcedo-Mata that she and her boyfriend had fought, that he fled down the street, and that she was about to leave, fearing his return. She said they had argued over a cell phone, that he became enraged and placed his hands around her neck, and then slapped her against the wall.

Stacey gave the officers defendant's name and physical description. Officer Salcedo-Mata drove about a half mile searching for him before returning to interview Stacey. She explained that when she told defendant she could not give him a ride to court the next day, he became enraged, placed his hands around her neck, and then pushed her against the wall, slamming her lower back into the wall and causing her to fall. She screamed and defendant ran out. Stacey complained of pain in her lower back, but Officer Salcedo-Mata saw no injuries. Officer Salcedo-Mata used Stacey's cell phone to call defendant. He identified himself as a police officer, and when he asked defendant whether he was Mr. Ferreira, defendant replied, "No. Yes. What's going on?" Officer Salcedo-Mata then asked, "What happened with you and your girl?" and defendant

---

**2**     Defendant's written plea agreement was not included in the appellate record, but the probation conditions recommended by the probation department in its pre-plea report included the conditions that defendant obey all laws and abstain from alcohol. Defendant does not contend that the allegation regarding Stacey, if true, would not be a violation of any condition of his probation.

replied, "Oh, well, it was just an argument," and told the officer he was nowhere near the area. Officer Salcedo-Mata told him not to come back or to bother Stacey.

Officer Salcedo-Mata testified that the following day he heard another radio call involving the same address. Although other officers responded to the call and interviewed Stacey, Officer Salcedo-Mata and his partner went there too because they recognized the address from the day before. The other officers took Stacey's report that defendant had called her house about 12 times.

Stacey testified that she and defendant were in a dating relationship from about January 2012 until August 11, 2013, when she arrived home to find defendant on the couch with a large bottle of vodka. Defendant appeared to be drunk and angry. As he usually did when he had been drinking he called her names such as "whore" and "slut" and accused her of having been with someone, not at work as she claimed. When defendant got up to use the bathroom, Stacey followed him and told him to leave. Defendant continued to call her names, and as she approached him, he took her cell phone away, put both his hands around her neck, pushed her against the wall, and squeezed her neck in an upward motion, lifting her body up so that her feet no longer touched the floor. Defendant held Stacey there for about two seconds, released her, and then threw her cell phone into the hallway. Stacey retrieved the phone and ran to her bedroom to call 911 as defendant left the house. The 911 operator told her to get into her car, park away from the house, and wait for the police. She parked about a block away and saw defendant walking. Stacey testified that she had small marks on her neck, and a sore spot that felt like a bruise, but no visible bruises.

### Other incidents involving Stacey

Stacey acknowledged that her relationship with defendant had been tumultuous, with fighting and drinking by both of them. She claimed that defendant had "head-butted" her in the eye in April 2013, causing redness and a bruise. She identified exhibit 1 as a photograph she took of herself showing the redness around her eye. The same

4

evening, Rhonda[3] invited her to a party, and when Stacey told her about her eye, Rhonda suggested that she cover it with makeup. Stacey took her advice and went to the party, which defendant also attended.

After the incident of August 11, Stacey sent text messages to defendant to the effect that their relationship was over, and she contacted defendant's probation officer to report what had happened. On August 25, 2013, defendant telephoned Stacey several times, sounded drunk, called her a slut, and accused her of sleeping with someone. When Stacey stopped answering his calls, he came to her house and knocked loudly. Instead of answering the door, she called the police.

When defendant learned that Stacey had contacted the police and his probation officer about the August 11 incident, he said he could go to jail for a really long time and asked her to tell them it had been a misunderstanding and never happened. Stacey did as he asked; she left a voice message for the probation officer saying that nothing had happened, it was a misunderstanding, and that she had lied about the entire incident because she thought defendant was cheating on her.

When Stacey hired a party bus for a 2013 Halloween party, she invited a couple of defendant's friends to ride the bus. They persuaded Stacey to allow defendant to come along, promising to keep him under control. Later, when the bus returned to Stacey's house, she invited her friends in, but not defendant, who was passed out in the bus. Others put defendant in a friend's car, and joined the party. When defendant woke up, he "stormed" into the house and falsely accused Stacey of having a naked man in her room. Defendant was restrained and taken home.

The following month, Stacey organized a "pub crawl" for her friends on a commuter train. Defendant invited himself, became upset when he learned that Stacey was dating, and left the train at the last stop, while the others went on to Stacey's home. Later, defendant and others arrived at Stacey's house uninvited, and when she objected, defendant became angry, took a bottle of vodka from the freezer and chased her.

---

[3] Rhonda is presumably defendant's friend Rhonda Allan, who testified for the defense.

Someone grabbed defendant and he left with his friends. Stacey explained that she did not call the police because there was no physical contact.

Stacey was dating another man, Sean, and when she became pregnant, she told both Sean and defendant that he was the father. In January 2014, when Stacey was in the hospital due to an overdose of medication, she sent Sean the photograph of herself taken after defendant had hit her in the eye. Stacey denied that she told Sean that the incident was the cause of her being in the hospital.

### *Incident involving Jacqueline*

Jacqueline (the victim in the underlying case) testified that she received a telephone call in early 2014 from a man who sounded drunk. He said hello, but hung up when she greeted him as "Jeremy." Jacqueline testified she believed it was defendant because it was a number with a 626 area code, although it was not the number he had used in the past. She could no longer remember other details she had given to district attorney investigators, and she did not retrieve the caller's number from her records as she told them she would.

The trial court admitted the investigators' report into evidence. When the investigators interviewed Jacqueline on April 11, 2014, she told them that she asked the caller whether he was Jeremy, and he replied, "Yeah, you know who this is. Now you know how to reach me if you ever want to reach me."

**Defense Evidence**

Michelle Madrigal (Madrigal) testified that she was defendant's probation officer since January 2013. She and Stacey spoke on August 14, 2013, about the August 11 incident. On August 21, 2013, Madrigal received a voicemail message from Stacey that she had lied about the entire incident because she thought defendant was cheating on her.

Margaret Kakish (Kakish), a long-time friend of defendant, testified that she had socialized with defendant and Stacey while they were a couple. Kakish thought they argued mostly because one of them was jealous of the other. Kakish was present at defendant's home one day in February 2014, when he received about 15 telephone calls which he did not answer. He told Kakish that it was Stacey calling. Finally, Kakish told

6

him to answer, and she spoke to Stacey, who told her that she was downstairs, loved defendant, was worried about him, and wanted to see him. Defendant then went downstairs to speak to Stacey.

Sean Lorenzini (Lorenzini) testified that he dated Stacey from October 2013 to early January 2014. In December 2013, Stacey told him that she was pregnant by him. On New Year's Eve she told him she was staying home because she was sick, and sent him a photograph of her in bed. He later learned that she had given a party that night and that defendant attended. Lorenzini also heard that defendant was living in her house. In early January 2014, Stacey told Lorenzini she was in the hospital because defendant hit her. When he expressed disbelief, she texted a photograph to him (exhibit 1), followed by another text, which read: "Just got to my mom's. So you know I'm not lying and how crazy this guy is. I am changing my number tomorrow and moving next weekend. He is nuts and I guarantee everything he said is a lie." In a text message sent the following day, Stacey asked Lorenzini to stop contacting defendant, who was sending her mother messages threatening Stacey's life and showing her mother the texts that Stacey had sent to Lorenzini. The message concluded: "Please stop. I have gone through enough with this idiot. I don't need more." Lorenzini testified that he stopped dating Stacey because she "proved just to be a lying . . . whore."

Eric Chau, who was married to defendant's sister Emily Love, testified that defendant stayed with them for several months after defendant was released from jail in March 2013. During that time they worked out together four or five days per week in Chau's garage. Stacey joined them several times a week. Stacey did not wear make-up on those occasions and Chau never saw her with a black eye.

Defendant's sister, April Love, testified that she picked up defendant's belongings when he was in jail, including his cell phone. She verified the number he had for over 10 years. Love was a special effects make-up artist and operated two make-up schools. In her opinion it would require heavy make-up or air brush make-up over the entire face to hide a bruise. Love never saw Stacey wear that type of make-up in March 2013. Shown the photograph marked exhibit 1, Love confirmed that it depicted a bruise on the left eye.

7

Rhonda Allan testified that she was a friend of defendant and socialized with him and Stacey. She never saw Stacey with a black eye, and Stacey never told her that defendant had given her a black eye. Once in 2013, Stacey said she could not go out because she had an eye infection and sent a photograph, which Allan identified as the exhibit 1 photograph.

## DISCUSSION

### I. Continuance

Defendant contends that the trial court abused its discretion in granting the continuance requested by the prosecutor. On March 21, 2014, when the probation revocation hearing was first called, the prosecutor was ready to present the testimony of Officer Salcedo-Mata, but asked for a continuance to obtain Stacey's appearance.

Section 1050 applies to continuances of criminal proceedings, including probation revocation hearings. (*People v. Johnson* (2013) 218 Cal.App.4th 938, 942.) "Continuances shall be granted only upon a showing of good cause. Neither the convenience of the parties nor a stipulation of the parties is in and of itself good cause." (§ 1050, subd. (e).) Courts have held that "[a] showing of good cause requires a demonstration that counsel and the defendant have prepared for trial with due diligence. [Citations.]" (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037 (*Jenkins*).) In evaluating good cause, the court must consider "'"'not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on the other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion.'" [Citation.]'" (*People v. Henderson* (2004) 115 Cal.App.4th 922, 934.) When the continuance is sought due to an absent witness, demonstrating good cause includes a showing of due diligence to secure the attendance of the witness. (*Jenkins, supra*, at p. 1037.)

Diligence in securing the presence of a witness is just one component of good cause for a continuance. (See *People v. Henderson, supra*, 115 Cal.App.4th at p. 934.) The trial court has broad discretion to determine whether the moving party has demonstrated good cause, and we review its ruling for abuse of discretion. (*Jenkins,*

*supra*, 22 Cal.4th at p. 1037.)  In general, under the abuse of discretion standard, "[t]he trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712, footnotes omitted.)  It is defendant's burden to demonstrate that the trial court's decision was irrational, arbitrary, or not "'grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' [Citation.]" (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977.)  In addition, defendant  must demonstrate that the ruling resulted in prejudice. (*People v. Zapien* (1993) 4 Cal.4th 929, 972.)

Relying on authority regarding the admission of prior testimony of an unavailable witness and the constitutional right of confrontation, rather than the court's discretion under section 1050, defendant contends that this court must independently review the trial court's factual finding that the prosecution demonstrated due diligence. (See *People v. Cromer* (2001) 24 Cal.4th 889, 901.)  Defendant also suggests that the trial court was required to hold the prosecution to the same strict standard of diligence to have a witness declared unavailable for purposes of admitting prior testimony. (See generally, *People v. Herrera* (2010) 49 Cal.4th 613, 621-622; Evid. Code, §§ 240, subd. (a)(5), 1291.)  We decline to expand the application of such principles to a motion to continue a probation hearing, as defendant has cited no authority for doing so and defendant's claim of error is not based upon the right of confrontation or the admission of prior testimony.

The trial court found that the prosecution had not unduly delayed its attempt to serve a subpoena and that its efforts were reasonable under the circumstances.  That finding was supported by substantial evidence.  The prosecution called John Cheslock, senior investigator for the Los Angeles County District Attorney's office.  He testified that another investigator attempted to serve Stacey with a subpoena five days before the March 21 hearing, at the address listed in the police report.  When there was no response, the investigator unsuccessfully tried to contact a neighbor, and then left a business card at Stacey's door.  Investigator Cheslock followed up on the day of the hearing by calling

9

two telephone numbers listed in the police report. The first was disconnected and the second was the number of Stacey's ex-employer, who said she had left approximately one month before, without leaving information regarding her whereabouts.

In addition, the prosecutor represented to the court that when she last spoke to Stacey on March 13, 2014, she told Stacey that her appearance in court on March 21 was required, and that she would be subpoenaed. The prosecutor did not perceive any unwillingness to cooperate, and had no reason to believe that the residence address on file was not valid. During the afternoon session, the prosecutor represented to the court that she had telephoned Stacey during lunch hour. Stacey answered, verified that her address was the same, but she did not get a subpoena or see the card left at her home. Stacey also claimed that she was in Las Vegas at that time.

No abuse of discretion is established where, as here, the record demonstrates that the trial court engaged in "a reasoned assessment of the need for delaying the [proceeding] in light of the potential problems such delay might cause." (*People v. Fuiava* (2012) 53 Cal.4th 622, 651.) Despite finding due diligence, the trial court deferred ruling until after hearing the testimony of Officer Salcedo-Mata. The trial court then made a preliminary finding that Stacey's statements to Officer Salcedo-Mata were spontaneous statements which were admissible as exceptions to the hearsay rule, and that there would be no violation of defendant's Sixth Amendment right of confrontation to rule solely on the basis of Officer Salcedo-Mata's testimony.[4] However, the court noted that due process would be best served by hearing Stacey's testimony and permitting cross-examination.

The court also found that defendant had a due process right to have his hearing within a reasonable time, and it considered what the courts had deemed reasonable in

---

[4]     See Evidence Code section 1240; *People v. Gonzales* (2012) 54 Cal.4th 1234, 1270-1271.

comparable proceedings.[5]  The trial court concluded that although a reasonable continuance was warranted, it would also consider releasing defendant from custody. After further hearing, the court released defendant on his own recognizance under the supervision of his uncle, Jim Love, with specified conditions, and set a progress hearing on defendant's release for April 9, 2014.  At the progress hearing, the trial court ordered defendant to wear an electronic monitor, and scheduled the continued revocation hearing for May 8, 2014.  On that date, Stacey appeared and testified.[6]

The record thus demonstrates that the trial court exercised reasoned judgment guided by appropriate legal principles, carefully considered the benefits and burdens on the parties and the court, as well as whether substantial justice would be accomplished or defeated by a continuance.  Defendant has not met his burden to show otherwise.

Defendant also complains that the prosecution did not file a written motion which complied with the procedures described in subdivision (b) of section 1050, and that Investigator Cheslock's testimony was largely hearsay.  The provisions of section 1050 are by its terms directory only (§ 1050, subd. (l)), and we observe that defendant did not object to the absence of a written motion.  Further, defendant did not object to the testimony of the investigator.  He may not challenge its admission now.  (See Evid. Code, § 353.)

Defendant contends that on April 9, 2014, the prosecution made a second motion to continue the hearing from April 9 to May 2, 2014.  He suggests that the trial court erred in granting that second motion because the prosecution failed to show any further attempt to locate Stacey.  We find no second motion in the record, or any indication that when it granted the motion for continuance on March 21, the court intended to hear evidence on the alleged probation violation on April 9.  It appears that the intention of the

---

[5]    See *Morrissey v. Brewer* (1972) 408 U.S. 471, 488 (*Morrissey*) [two months], and *In re Williams* (1974) 36 Cal.App.3d 649, 652-653 [2 months, 25 days].

[6]    The prosecutor originally requested a two-month continuance because Stacey had said she would be traveling in China.  Stacey later admitted that she lied about China because she did not want to go court or to cause defendant to go to jail.

11

court on March 21, was to set the continued hearing for a later date, as the court indicated that the purpose of the April 9 hearing was to receive a progress report regarding defendant's conditions of release and to order electronic monitoring. On April 9, the court stated that there had been an off-the-record discussion about when to resume the probation revocation hearing. Although the parties had agreed on May 2, the prosecution requested additional time and the court scheduled the hearing for May 8. There was no second motion to continue on April 9.

Regardless, defendant has not demonstrated that the continuance resulted in prejudice. Prejudice from the continuance of a probation revocation hearing is demonstrated when the hearing is not held within a reasonable time after the defendant's arrest, resulting in unavailability of witnesses or loss of evidence, or in some other way the defendant's ability to defend against the probation violation allegations is hindered. (*People v. Johnson, supra*, 218 Cal.App.4th at p. 943.)

On March 21, 2014, the trial court found that defendant had been in custody for 15 days. The order granting the continuance resulted in a delay of 48 days; thus, the May 8 hearing was held just over two months after defendant's arrest. On May 8, when it appeared that the hearing could not be completed, the court continued the matter on its own motion and without objection to May 29, 2014. Thus, the entire delay from the time of arrest to the completion of the hearing was about three months, which cannot be deemed unreasonable without a showing of prejudice. (Cf. *Morrissey, supra*, 408 U.S. at p. 488 [two-month delay in parole revocation hearing]; *In re O'Connor* (1974) 39 Cal.App.3d 972, 977-978 [117 days]; *In re Williams, supra*, 36 Cal.App.3d at pp. 652-653 [2 months, 25 days].)

Defendant contends it was burdensome to his witnesses to have to come back repeatedly to court, for him to wear an electronic monitor, and for the defense to face additional allegations that prosecution investigators were able to uncover during the

12

delay.[7]  However, as defendant does not contend that there was a loss of evidence or that his witnesses became unavailable, or that in some other way he was unable to mount a defense, he has failed to show prejudice.  (See *People v. Johnson, supra*, 218 Cal.App.4th at p. 943.)

## II.  Due process

A probationer is entitled to the same "'"minimum requirements of due process"'" afforded parolees, as outlined in *Morrissey*.  (*Gagnon v. Scarpelli* (1973) 411 U.S. 778, 782; *People v. Vickers* (1972) 8 Cal.3d 451, 457 (*Vickers*).)  These include written notice of the alleged violations of probation, disclosure of the evidence against him, the opportunity to present evidence, and to have the revocation hearing held within a reasonable time after the probationer is taken into custody.  (*Vickers*, at p. 457.)

Defendant contends that his right to due process was violated by undue delay before and after his arrest, inadequate notice of the evidence against him, and the refusal of the trial court to hear defendant's mitigation evidence.

### A.  Delay in filing

Defendant contends that due process required the revocation proceedings to be commenced within a reasonable time after the alleged violation, apparently without regard to his custody status.  Though defendant suggests that *Vickers* supports his position, that case did not hold that due process requires the initial revocation request or motion to be filed within a reasonable time of the action, regardless of defendant's custody status.  *Vickers* held that the due process protections outlined in *Morrissey* were equally applicable to probation revocation proceedings; however, as "*Morrissey* directed its attention only to the situation where there had been an actual deprivation of individual liberty," those protections have less application prior to the commencement of the probation violation process.  (*Vickers, supra*, 8 Cal.3d at pp. 457, 460.)

Defendant also relies on a comparison to two federal cases, *United States v. Tyler* (5th Cir. 1979) 605 F.2d 851 (*Tyler*), and *United States v. Hamilton* (9th Cir. 1983) 708

---

[7]    The court found that only the August 11 violation was proven by a preponderance of the evidence, and thus rejected the additional allegations.

F.2d 1412 (*Hamilton*). In *Tyler*, a due process violation was found where three alleged violations had been known to the probation officer for three years, and an intervening revocation petition had been filed on other grounds and rejected. (*Tyler, supra*, at p. 853.) In *Hamilton*, the probationer had been required to spend 60 weekends in jail, missed his 50th weekend, and tried to alert the court and cure his default, but the probation officer delayed three years before seeking revocation. (*Hamilton, supra*, at p. 1415.)[8] These federal cases do not assist defendant, as the delay in this case was insignificant in comparison, and there was no intervening petition. Here, the trial court based its decision to revoke defendant's probation on the violation which occurred on August 11, 2013. The motion for revocation was filed less than six months later, on January 30, 2014.

Moreover, in finding the delay unreasonable in *Tyler*, the court reasoned: "Absent some unusual circumstance or some deception by the probationer such a lengthy delay, coupled with the probation officer's obvious decision not to file these charges in the first petition, is fundamentally unfair." (*Tyler, supra*, 605 F.2d at p. 853, fn. omitted.) Here, it cannot be said that there was no deception on defendant's part. Prior to the hearing, the trial court heard the testimony of Probation Officer Madrigal regarding the delay in filing. Madrigal testified that when Stacey first informed her of the August 11 incident on August 14, 2013, she asked Stacey to contact the police and obtain a copy of the report. When Stacey did not follow through, Madrigal unsuccessfully attempted to obtain a report from the police department. She then attempted to obtain a written statement from Stacey. Stacey refused, and on August 21, 2013, Stacey left the voice message that she had lied because she thought defendant had been cheating, and said she had also informed the police that she had lied. Madrigal's further attempts to reach Stacey were unsuccessful. Later, at the revocation hearing, Stacey testified that defendant had asked her to recant so that he would avoid a probation violation, and he suggested to her what to say. Due process does not require that a defendant profit by his own wrongdoing. (See

---

[8]    The revocation of Hamilton's probation was held to be an abuse of discretion. (*Hamilton, supra*, 708 F.2d at p. 1414.)

14

*Vickers, supra*, 8 Cal.3d at p. 460.) As defendant persuaded Stacey to deceive the police and his probation officer, he may not be heard to complain about the delay he encouraged.

### B. Delayed hearing

Defendant contends that the continuance caused an unfair delay in his right to a timely hearing. As we have already determined, the hearing was held in this case within a reasonable time after defendant was taken into custody. He was thus afforded this due process requirement. (*Morrissey, supra*, 408 U.S. at p. 488.)

In any event, a delay in affording a revocation hearing is not a violation of due process where it appears that no unfairness resulted. (*In re La Croix* (1974) 12 Cal.3d 146, 154.) Although defendant complains that one of his witnesses was inconvenienced, he does not point to any evidence that was not preserved or demonstrate that he was prevented from mounting a defense. There is no indication in the record that evidence was lost or witnesses became unavailable. We discern no unfairness in the proceedings.

### C. Disclosure of evidence

Defendant contends that he was not presented with adequate notice of the evidence against him, because the police report attached to the prosecution's motion for revocation did not mention Officer Salcedo-Mata's conversation with defendant on Stacey's cell phone. Defendant claims to have had "absolutely no notice" that Officer Salcedo-Mata would testify as he did. Defendant suggests he was harmed by the nondisclosure because he was left without the ability to discredit the officer while the trial court relied heavily on defendant's admission, "Oh, well, it was just an argument."

Although the telephone conversation was not mentioned in the police report, the record does not reflect that defendant had "absolutely no notice" of the conversation. We cannot presume error, and defendant has not met his burden to affirmatively demonstrate error by an adequate record. (See *People v. Blackwood* (1983) 138 Cal.App.3d 939, 949.) Further, when Officer Salcedo-Mata testified, defendant did not object to the testimony or otherwise indicate to the court that it was a surprise. Absent an objection in

15

the trial court, we will not infer inadequate notice from a silent record. (*People v. Baker* (1974) 38 Cal.App.3d 625, 629.)

Moreover, defendant has not demonstrated that he was left without the ability to discredit the officer. The revocation motion with the attached police report was filed one week before defendant first appeared in court with counsel. The hearing began three weeks later, after an investigator was retained. At no time did defendant claim that three weeks gave him insufficient time to investigate the allegations. Instead, counsel announced he was ready and resisted a continuance. Defense counsel cross-examined Officer Salcedo-Mata and brought out the fact that the telephone conversation was not mentioned in the report. When the officer completed his testimony, he was excused subject to recall. The hearing was then delayed more than two weeks and then three more weeks, giving the defense ample time to investigate and recall the officer if necessary. Under such circumstances we cannot assume that defendant had no knowledge of the conversation or that he was deprived of the ability to defend against it.

### D. Mitigation evidence

A probationer's due process right to be heard includes having the opportunity to show "that circumstances in mitigation suggest that the violation does not warrant revocation." (*Morrissey, supra*, 408 U.S. at pp. 488.) Defendant contends that he was denied this opportunity.

To demonstrate error, defendant refers to the first day of hearing on March 21, when defense counsel named the witnesses he expected to call, and explained to the court that some of them would provide mitigation evidence. Defendant also refers to the beginning of the third and last day of hearing, May 29, when the court said, "[L]et me tell the parties we're going to finish this case today. So the evidence is going to be completed today. With regard to mitigation, I'm not going to be hearing mitigation evidence. I'll address that in a moment. But to me if I find a violation, mitigation is relevant to what I'm going to do. I'm not going to hear that evidence before I've made a decision about what I'm doing."

16

The prosecution then presented its remaining evidence, and the defense was able to call its witnesses, who primarily impeached Stacey's credibility. After the court found defendant in violation of probation, but before sentencing, defense counsel offered some information about a residential rehabilitation program, but the trial court said, "I don't need to review that because I am going to impose the sentence that I had suspended." However, the court indicated that it had read the supportive letters submitted on defendant's behalf.

Although defendant does not make clear just what evidence in mitigation the trial court excluded, he appears to contend that the court refused to hear mitigating testimony from defense witnesses prior to finding a violation, and that the information regarding a rehabilitation program was additional mitigating evidence offered and refused after the court's violation finding.

"[T]here are often two stages in parole/probation revocation proceedings. The initial stage determines 'guilt': did the probationer engage in the conduct which is alleged to have violated his probation? The second stage determines 'disposition' or 'sentencing': if he has violated probation, what is the appropriate disposition of the probationer? [T]he 'guilt' phase . . . does not require . . . any consideration of mitigating factors unconnected to 'guilt' of the charged conduct . . . . However, the sentencing phase appropriately includes consideration of . . . evidence or arguments in mitigation or explanation as the defendant may appropriately submit. While *Morrissey* acknowledged a parolee has a right to a hearing (with concomitant due process protections) before a *final* disposition of his status is made, nothing in *Morrissey* suggests the court must consider 'sentencing' data during the 'guilt' phase." (*People v. Santellanes* (1989) 216 Cal.App.3d 998, 1004, fn. 6.) Thus, to the extent that defendant contends that the trial court should have heard mitigating testimony from his witnesses prior to finding a violation, his contention is without merit.

Defendant did not offer the testimony of witnesses after the violation finding. Defendant concludes that the information regarding the residential treatment program was mitigating evidence, but fails to explain how simply knowing about the rehabilitation

17

facility might influence the trial court to find that defendant would be a good candidate for the reinstatement of probation or for the program. Further, it does not appear that defendant informed the court that the information contained mitigating facts, and the information is not in the appellate record. Defendant has not demonstrated error.

## III.  Substantial evidence

Defendant contends that the trial court's decision to revoke probation was not supported by sufficient evidence that he violated the terms of his probation.

A court may revoke probation "if the interests of justice so require and the court, in its judgment, has reason to believe . . . that the person has violated any of the conditions of his or her supervision." (§ 1203.2, subd. (a).) "We review a probation revocation decision pursuant to the substantial evidence standard of review [citation], and great deference is accorded the trial court's decision, bearing in mind that '[p]robation is not a matter of right but an act of clemency, the granting and revocation of which are entirely within the sound discretion of the trial court. [Citations.]' [Citation.] [¶] 'The discretion of the court to revoke probation is analogous to its power to grant the probation, and the court's discretion will not be disturbed in the absence of a showing of abusive or arbitrary action. [Citations.]' [Citation.] 'Many times circumstances not warranting a conviction may fully justify a court in revoking probation granted on a prior offense. [Citation.]' [Citation.] '"[O]nly in a very extreme case should an appellate court interfere with the discretion of the trial court in the matter of denying or revoking probation. . . ."' [Citation.] And the burden of demonstrating an abuse of the trial court's discretion rests squarely on the defendant. [Citation.]" (*People v. Urke* (2011) 197 Cal.App.4th 766, 773.)

Applying the substantial evidence standard here, we review the entire record of the probation revocation proceedings, viewing the evidence in the light most favorable to the trial court's order, presuming in support of the order the existence of every fact the court could reasonably deduce from the evidence. (See *People v. Jones* (1990) 51 Cal.3d 294, 314.) Most significant to our discussion in this case is the rule that "it is the exclusive province of the trial [court] to determine the credibility of a witness and the truth or

18

falsity of the facts on which that determination depends. [Citation.] Thus, if the [order] is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]" (*Ibid.*) We do not reweigh the evidence, and must draw all reasonable inferences in support of the order. (*People v. Culver* (1973) 10 Cal.3d 542, 548.)

Despite these constraints on appellate review, defendant's substantial evidence discussion consists entirely of arguing that the evidence should be reweighed and the credibility of the witnesses should be resolved in derogation of the trial court's findings. Defendant argues that Stacey's testimony could not support the finding that defendant violated his probation, because it was established that she lied on numerous occasions, to the probation officer, the police, the prosecutor, and to her former boyfriend; and even the trial court acknowledged that there was significant impeachment of her testimony. Defendant also suggests that the trial court should not have considered Officer Salcedo-Mata's testimony in finding that Stacey was credible, in part because the trial court erred semantically in referring to Officer Salcedo-Mata's testimony as corroboration, when it should more properly have been considered as rehabilitative evidence; and because the officer observed no marks or physical injuries on Stacey. Defendant also implies that the trial court should not have considered any of his statements to Officer Salcedo-Mata, because the court mistakenly believed that the officer testified that defendant refused to speak to him or hung up on him after stating that he and Stacey had argued. Finally, defendant points out that his admission that there had been an argument was not an admission that he committed acts of physical violence against Stacey; and that the fact that he left after the argument did not prove that he fled with a consciousness of guilt.

The trial court acknowledged concerns about Stacey's testimony, and indicated that Officer Salcedo-Mata's testimony was an important factor in finding her to be credible.[9] Indeed, the officer's testimony did bolster Stacey's version of the incident, as

---

[9] The trial court carefully outlined its resolution of the credibility issues. The court did not give great weight to Lorenzini's testimony since, although he was credible he

19

the trial court could reasonably infer from the officer's description of Stacey's distraught demeanor, along with defendant's admission on the telephone that there had been an argument, that the argument was more than verbal.

More importantly, however, the trial court found Stacey to be credible based upon its own observation of her testimony in court, and the court expressly found that Stacey had testified truthfully about the August 11 event. "'"To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]"'" (*People v. Mayberry* (1975) 15 Cal.3d 143, 150.) Defendant does not contend that Stacey's version of the incident was physically impossible, and his demonstration of falsity depends entirely upon the inferences he has drawn from conflicting evidence and the absence of physical injuries. We thus defer to the trial court's determination that Stacey was a credible witness and that the incident occurred as she described it in court. It follows that her testimony alone, with or without consideration of Officer Salcedo-Mata's testimony, was sufficient to support the trial court's finding that defendant engaged in the conduct alleged to be a violation of his probation.

Defendant makes a similar argument with regard to Jacqueline's testimony. He contends that the trial court erred in giving greater weight to Jacqueline's prior inconsistent statements to investigators than to her testimony in court. Again, "we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]" (*People v. Jones, supra*, 51 Cal.3d at p. 314.) In any event, the trial court held that the August incident alone established a serious violation.

appeared to carry some anger, and Stacey's motive for lying to him appeared to be an attempt to hold on to their relationship and to deflect some issue with defendant.

20

As defendant failed show that the August incident was unsupported by substantial evidence or that the court's reliance on that incident alone was abusive or arbitrary, he has not demonstrated an abuse of discretion. (See *People v. Urke, supra*, 197 Cal.App.4th at p. 773.)

## IV. Custody credit

Defendant contends that pursuant to section 2900.5, subdivision (f), he is entitled to credit for the time he was out of custody on his own recognizance with conditions which restricted his freedom of movement, both before and after he was placed on electronic monitoring. It is defendant's burden to demonstrate that he was entitled to additional custody credit. (*People v. Shabazz* (2003) 107 Cal.App.4th 1255, 1258.)

As respondent observes, it is section 2900, subdivision (a) which is relevant here, as it relates simply to time in custody, not subdivision (f), which provides for alternative sentencing programs. At the time defendant was out of custody with electronic monitoring, section 2900.5, subdivision (a), provided in relevant part: "In all felony and misdemeanor convictions, either by plea or by verdict, when the defendant has been in custody, including, but not limited to, any time spent in a jail, camp, work furlough facility, halfway house, rehabilitation facility, hospital, prison, juvenile detention facility, or similar residential institution, all days of custody of the defendant, including days served as a condition of probation in compliance with a court order, credited to the period of confinement pursuant to Section 4019, and days served in home detention pursuant to Section 1203.018, shall be credited upon his or her term of imprisonment . . . ." (Stats. 2011, ch. 15, § 466.)

Thus, defendant may receive custody credit only for periods of confinement in described facilities or similar residential institutions, and in home detention if the home detention complies with section 1203.018. Section 1203.018 provides that the board of supervisors of any county could provide for a program under which eligible inmates being held in lieu of bail in a county jail or other county correctional facility may participate in an electronic monitoring program upon conditions specified in the statute, to which the inmate was required to agree in writing. Defendant was not eligible for

home detention under the statute, as the court had not set bail, and he was thus not being held in lieu of bail. Further, the record does not reflect that the electronic monitoring program under which defendant was released met any of the other requirements of section 1203.018, or that defendant met other conditions of the statute, or that he signed an agreement as required by the statute.

Defendant contends that his claim for additional custody credit is supported by *People v. Lapaille* (1993) 15 Cal.App.4th 1159 (*Lapaille*), which was decided prior to the enactment of section 1203.018, at a time when electronic home detention was available only to sentenced inmates, under the conditions of section 1203.016. (See *Lapaille, supra*, at p. 1165.) The defendant in *Lapaille* was released prior to trial on his own recognizance, under very restrictive conditions which the appellate court considered just as "custodial" as the electronic home detention program; the only real difference was that the defendant's location was verified by telephone calls rather than by electronic tracking. (*Id*. at pp. 1169-1170.) The court concluded that this procedural difference was not a legitimate basis for treating the defendant differently from those placed in electronic home detention programs, and held that he was entitled to custody credit as a matter of equal protection. (*Id*. at p. 1170.)

*Lapaille* does not support defendant's claim, as section 1203.018 now extends the same conditions and privileges to pretrial custody, and defendant has not demonstrated that the conditions of his release were so restrictive as to be deemed custodial in nature, either before or after he was fitted with a monitor. In *Lapaille*, the defendant was ordered to remain at home at all times, except when he walked his daughter to and from the school bus; there was no indication that he ever left his home for any other purpose, and his compliance was verified by telephone. (*Lapaille, supra*, 15 Cal.App.4th at p. 1169.) Here by contrast, defendant was afforded a great deal more freedom. He was required to live with his uncle, but permitted to go to work unsupervised from 9:00 a.m. to 5:00 p.m., and attend AA, therapy sessions, and church, if transported by his uncle. Before defendant was fitted with an electronic monitor, there was no verification of his location or hours. Indeed, the district attorney investigator submitted a report indicating that on

22

April 11, 2014, defendant was seen at the Pasadena courthouse at approximately10:00 a.m., conducting business unrelated to his work at the time, and then given a ride by someone who was not his uncle. Finally, the record does not include monitoring reports for the period from April 16 to May 29, 2014, or any other evidence of his compliance with the conditions of his release.

In sum, defendant was released on his own recognizance under unverified, relatively liberal conditions not comparable to custodial detention, and no evidence in the record indicates that electronic monitoring was effective in verifying his compliance with the conditions. Section 2900.5 does not require custody credit simply because the defendant has been ordered to be at home during certain hours, to attend only approved events, and to report periodically to authority. (Cf. *People v. Pottorff* (1996) 47 Cal.App.4th 1709, 1716-1719 [conditions of bail]; *People v. Reinertson* (1986) 178 Cal.App.3d 320, 327 [conditions of probation]; *In re Debra S.* (1982) 135 Cal.App.3d 378, 385-386 [same].) Defendant has not met his burden to demonstrate that he was entitled to additional custody credit.

### DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ


We concur:


_____, P. J.
BOREN


_____, J.
HOFFSTADT

23